## Illinois Steel Company v. Joseph H. Strong, Administrator.

### Gen. No. 12,759.

1. ASSUMED RISK—*when doctrine of, applies, when not.* If a servant knew of his danger or by the exercise of ordinary care would have known of it, or was warned of such danger by the master, he assumes the risk; if he was ignorant of the danger and had no opportunity to learn of or know of such danger, or was not warned of it, then he does not assume the risk.

Action on the case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. AXEL CHYTRAUS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1905. Affirmed. Opinion filed November 23, 1906.

**Statement by the Court.** This is an appeal by the defendant from a judgment recovered against it for wrongfully causing the death of Alfred Larson, plaintiff's intestate, an employe of defendant.

The defendant unloaded iron ore from vessels by the use of machinery. A vessel to be so unloaded was placed alongside a wharf. From the wharf, booms that could be raised or lowered extended over the deck of the vessel, one over each hatchway. On each boom ran a carriage from which was suspended a scoop or grab with a capacity of five tons. This scoop resembled a clam shell and was lowered through the hatchway into the hold with the jaws open. When the jaws were imbedded in the ore they were forced together and in this way a load of ore, varying from one or two tons to five tons, was caught in the scoop. The scoop was then hoisted until its top struck the boom, when, by means of the carriage attached to the boom, the scoop was run back to the ore chutes or cars and the ore dumped by opening the jaws of the scoop. An ore vessel is divided into compartments by bulkheads placed midway between the hatchways. When the ore directly under a hatchway has been

taken out a power scraper is used to bring the remaining ore in the compartment under the hatchway. The scraper was operated by an engine and cables by means of which the man in control could move the scraper forward and backward.

July 29, 1902, the defendant was unloading the "Mataafa," which had thirteen hatchways. Verburg was in charge of the compartment under hatchway 7, Kelly was on deck, alongside of that hatchway in charge of the hoisting machinery, and Larson was sent by his foreman into the compartment to work under the directions of Verburg. A scoop with a load of about two tons was hoisted from that compartment and when it reached the boom a piece of ore dropped from between the jaws of the scoop, fell through the hatchway into the hold and struck Larson, causing his death. The case was submitted to the jury upon the two additional counts of the declaration.

The cause of death alleged in the first of these counts was, that the defendant negligently, etc., permitted said scoop filled with ore to be hoisted when the jaws thereof were apart and not close together, and that in consequence thereof a piece of ore fell from said scoop upon the deceased and inflicted injuries which caused his death.

The second of said counts set up the facts above stated, alleged that in hoisting said scoop pieces of ore were liable to and frequently did fall from said scoop into the hold of the vessel, making it dangerous for persons to be in the hold under the scoop while it was being so hoisted; that the defendant knew or by the exercise of ordinary care would have known that ore was liable to and frequently did fall from said scoop; that deceased did not know and was not guilty of want of ordinary care in not knowing that ore was liable to and did fall from said scoop; that defendant's foreman and vice-principal in charge and control of deceased ordered deceased to leave the work in which he was engaged, which was not dangerous, and

go into the hold of said vessel and work around said scoop, which was then hoisting ore where, if ore fell therefrom, the deceased was liable thereby to be struck and injured; that defendant through its foreman knew, or by the exercise of ordinary care would have known, that deceased was not familiar with said work and did not know of the danger of ore falling, as aforesaid; that it was the duty of defendant to instruct deceased how to avoid injury and to warn him that ore was likely to fall and did fall from said scoop as aforesaid, but defendant negligently, etc., failed to explain, instruct or warn deceased as aforesaid; that deceased, in obedience to said order, did go into said hold to do said work and while engaged therein, exercising ordinary care, etc., as a direct result of said negligence and failure of defendant to instruct deceased as to the method of doing said work and its failure to instruct and warn him of the likelihood of ore falling from said scoop, a piece of ore fell from said scoop, while it was being hoisted, and struck the deceased, inflicting injuries which caused his death.

KNAPP, HAYNIE & CAMPBELL and WILLIAM BEYE, for appellant.

JAMES C. McSHANE, for appellee.

MR. JUSTICE BAKER delivered the opinion of the court.

The grounds of reversal urged are, first, that the defendant assumed the risk, and second, that he was guilty of contributory negligence.

That ore was liable to fall and did fall back into the hold from a loaded scoop as it was hoisted, making it dangerous for a person to work in the hold under a loaded scoop, and that this was known to the defendant, is not disputed. If the deceased knew of this danger, or by the exercise of ordinary care would have known of it, or was warned of such danger by the de-

fendant, then he assumed the risk. If he was ignorant of the danger, had no reasonable opportunity to learn of or know such danger, and was not warned of it, then he did not assume the risk. C. & E. I. R. R. Co. v. Heerey, 203 Ill. 503; Alton Paving Brick Co. v. Hudson, 176 id. 270; Con. Coal Co. v. Haenni, 146 id. 614; McCormick Mach. Co. v. Burandt, 136 id. 170.

The contention of appellant that deceased was warned of the danger, is based entirely upon the testimony of Verburg. We will examine the evidence upon the questions, whether deceased was so warned, whether he had opportunity to learn of the danger and for that reason should be held to have assumed the risk, and whether he was guilty of contributory negligence, together.

Deceased was a Swede by birth, had been in this country but a few months, and the evidence tends to show, did not either speak or understand English. He had been employed in the "rigger" or "sailor" gang at defendant's rail mill a short time, and at his own request, was, on the day of his death, transferred to the "rigger" gang at defendant's unloading wharf. Primarily it was the duty of that gang, in case anything broke or got out of order about the unloading apparatus or machinery, to fix it, and as this might require them to go aloft they were called sailors or riggers. But they were required to do other work and we think that it cannot be said that the work in which deceased was engaged at the time of his death was outside of the work he was employed to perform.

He had worked on the deck of the vessel from one to two hours when his foreman, in answer to a request from Verburg to send him a man, took deceased into the compartment where Verburg was and pointed out Verburg to him as the man whom he was to help. Verburg was born in Holland and knew only the Dutch language when he came to this country. Here he had learned English, and testified that he had picked up some Swedish by working with Swedes.

When deceased came into the hold, Verburg had scraped all the ore from one part of the compartment and was ready to shift the scraper to another place. Deceased helped Verburg to shift the scraper and to scrape ore after the scraper had been shifted. Verburg testified that after the ore had been scraped into place and before the scoop came down for a load, he sent deceased on deck for a strap called a pennant; that deceased was gone ten or fifteen minutes and could not find the pennant; that while he was gone a couple of loads were hoisted; that when deceased came back into the hold, Verburg signalled to Kelly to stop the scraper so that deceased could step over it; that the scraper was stopped and deceased came alongside of Verburg; that Verburg with a hook then held the cable out of the way and signalled Kelly to send down the scoop; that the scoop came down, took a pretty fair load and started up; that after it had gone two or three feet Verburg started to go for the pennant himself and had gone but a short distance when, upon an alarm, he turned around and saw deceased lying on his back.

Bennett testified that he was standing alongside of hatchway 7; that when the scoop came up he noticed that it was open at the bottom about six inches; that when the scoop reached the boom there was a jar and a piece of ore fell out of the bottom of the scoop; that he looked down and saw the piece of ore strike deceased; that deceased was standing under the hatchway two or three feet in from a point under the outside line of the hatchway and appeared to be "fixing cables or something."

Verburg testified that when he left deceased he was standing under the deck under the stringer plate which was at the edge of the hatchway. As to the alleged warning he testified in chief as follows:

"Q. Now, what did you say, if anything, to Larson when you left him? A. I told him to stay where he was, that there were big stones coming down

every once in a while, and you have got to look out,''
and that Larson answered in Swedish, ''all right.''

Upon his cross-examination he testified that what
he said to deceased was said in Swedish and not in
English. He was asked to repeat in Swedish what he
said and gave an answer in Swedish. He was asked
if he did not on a certain occasion say to C. J. Ray,
speaking of the accident: ''I explained to deceased as
best I could that after the grab had gone up a few feet
from the ore pile he could let go of the cable. De-
ceased was standing in the side of the hold next to the
dock. I told him in English to look out for the ore
falling from the grab, but I don't know that he under-
stood me,'' and said that he did not. Ray testified
that Verburg did make such a statement, that witness
made a memorandum of it in his presence, and Ver-
burg was called again and denied the latter statement.
He admitted that after the accident, while he was in
Idaho, plaintiff's counsel sent him a paper containing
certain questions; that he wrote after each question
his answer in writing, signed the paper and returned
it. In this statement, which was put in evidence, in
answer to a request to state all that was said between
him and Larson in the hold of the vessel, and espe-
cially anything that he said to Larson in the way of
warning, the witness said: ''I told him to take the
cable out of the way when the grab went up to let it
go again and to stand in the side when the grab went
up, but I was very busy at the time and I am not posi-
tive whether the man understood me or not, as the
man was only down in the hold a few minutes.''
Upon redirect, Verburg was asked to repeat in
Swedish what he said to deceased, and said something
to the interpreter in Swedish, which the interpreter
was asked to translate. As to the proper translation,
the interpreter, the trial judge, a juror and plaintiff's
counsel did not wholly agree. The interpreter testi-
fied that the witness used broken Swedish which

would be difficult for a man who understood the Swedish language only, to understand.

We think that upon this evidence the question whether the defendant warned deceased that ore was liable to fall from the scoop, and of the danger therefrom if he went out from under the cover of the deck, was a question for the jury upon which their verdict must be held conclusive.

The evidence tends to show that the scoop in question was and for some days had been out of order; that its jaws were and had been so bent that they could not be closed within less than five or six inches; that they were six inches apart when the last load was hoisted and that the piece of ore which fell, fell because the jaws were so far apart.

When deceased first came on board the "Mataafa," he was sent back to the rail mill to get a transfer. After his return he worked on deck from one to two hours before he was taken into the hold. While on deck he had no opportunity to see whether any pieces of ore fell from a scoop while it was below deck. The vessel was 450 feet long with thirteen hatchways. It is not shown that any ore fell from a scoop while plaintiff was on deck, and with a vessel of that length ore might have fallen on one part of the deck without the knowledge of plaintiff if he happened to be at work upon another part of the deck. No scoop was hoisted after he went into the hold before he was sent for the pennant, and the first scoop that was hoisted after his return was the one from which the ore fell that killed him.

The question is not, whether the deceased might have discovered that ore was liable to fall from the scoops, but whether his failure to discover that ore was so liable to fall, is conclusive evidence of want of ordinary care on his part.

As has been said, "the faculty of close observation of objects is largely a gift." It is much stronger and more marked in some persons than in others, and

the same person will observe objects more closely under some circumstances than under others.    If he is accustomed to the work in hand, familiar with his surroundings, with the articles and machinery employed, and especially if such articles are few in number, the machinery simple, field of operations narrow, he will be likely to observe closely each object and notice what occurs, while if the work in hand, the surroundings, the articles and machinery employed are all new to him, the plant and field of operations extensive, the pieces of machinery and apparatus numerous and complicated, he cannot observe all of such objects closely, nor notice every occurrence.

If, from the evidence, we can say that the only just conclusion at which the jury might arrive was that the opportunities of the deceased to learn of the danger of ore falling from the scoop after it had been hoisted high enough to permit him to go under it were such that, if he had exercised ordinary care he would have learned of such danger, then we can say that the verdict is improper, because if he had such opportunities to learn of the danger, he assumed the risk.

So, if we can say from the evidence, that the circumstances were such that the only just conclusion at which the jury might arrive was, that if the deceased had exercised ordinary care he would have escaped injury, the verdict is improper, for under such circumstances the deceased would be guilty of contributory negligence.

If deceased was not warned of his danger by defendant, the question whether he assumed the risk, and the question whether he was guilty of contributory negligence, both depend upon the question whether the deceased knew or if he had exercised ordinary care would have known, and therefore ought to have known, that there was danger of ore falling from a scoop after it had been hoisted high enough to permit him to pass under it.

We are not prepared to hold that a man engaged in

the work in which deceased was engaged, under the circumstances surrounding him, with only his experience and opportunities of observation of the work of unloading ore from a vessel the size of the "Mataafa" by machinery, and with such care for his own safety as a reasonably prudent man ordinarily exercises, might not have failed to discover the danger of ore falling from said scoop upon him if he went under the scoop, and therefore cannot say that the jury were not warranted in finding both that the deceased did not assume the risk and that he was not guilty of contributory negligence.

The judgment of the Superior Court will be affirmed.

*Affirmed.*